UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DONALD JAMES MONACO | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil No. 03-1051 (JRT/RLE)<br>) |
| UNITED STATES DEPARTMENT OF JUSTICE, ET AL. | )<br>) |
| Defendants. | ) |

## DECLARATION OF BRUCE BARTON

1. I, Bruce Barton, do hereby declare that I am the Clinical Director at the United States Department of Justice, Federal Bureau of Prisons (BOP) facility known as the Federal Prison Camp, Duluth, Minnesota (FPC Duluth). I have been employed as the Clinical Director at FPC Duluth since December 1999.

2. As the Clinical Director at FPC Duluth, I review and supervise the clinical work of the Physician's Assistants, and review clinical charts of a percentage of patients seen by medical staff. I also examine and treat the more complicated inmate medical cases presented to me through a referral by a Physician's Assistant.

3. I am familiar with the plaintiff, Donald Monaco, federal register number 13314-006, as he is currently incarcerated at FPC Duluth. I am also aware that he has filed suit alleging that he has not received appropriate medical treatment for his migraine headaches and that his work assignment was detrimental to his health.

4. A review of the medical record indicates Plaintiff arrived at FCI Waseca on May 31, 2000. During his medical intake screening, he was noted to have hepatitis C, and had several medical complaints including migraines and joint pain. He was provided information concerning

procedures for being seen at sick call, which included how to obtain an appointment and the hours of operation.[1] On June 1, 2000, Plaintiff was seen by PA Peterson and his Imitrex nasal spray for migraines was refilled.[2]

5. During a psychiatric intake screening on June 2, 2000, Plaintiff reported that he had overdosed on drugs numerous times, starting at age 12. He was unsure whether they were accidental or suicidal in nature. He also reported gender identity problems. On June 14, 2000, Dr. Gray saw Plaintiff and he indicated he had good results from the Imitrex spray, and it had worked well the week before. The plan was to continue the Imitrex as needed *at the onset* of a migraine. He was also added to the list to be followed by the Neurology Chronic Care Clinic (CCC) every three months.

6. Since Plaintiff's arrival to FCI Waseca, he was also seen on a regular basis for his hepatitis C. However, he had been refusing treatment, and wanted to see a psychologist for anxiety. On September 8, 2000, Plaintiff was seen in CCC and reported having only three migraines during that time frame and noted the Imitrex was working well. He was to continue

---

[1] During a specific period of time each day, sick call is held for inmates to sign up and request to be seen by a clinician. Inmates are scheduled for appointments as they sign up, unless an inmate claims an emergency exists. If an inmate claims a medical emergency, or the staff member running sick call determines an emergency may exist, the inmate is triaged by a heath care provider to assess whether an immediate or urgent need exists, or whether an appointment can be scheduled for that day or a subsequent day.

[2] The medical record reflects Plaintiff received Imitrex nasal spray, however, he was provided Sumatriptan, which is the generic brand of Imitrex.

2

Monaco v. U.S. Department of Justice, et al.
Civil No. 03-1051 (JRT/RLE)

the Imitrex and return for follow-up in three months. On September 28, 2000, Plaintiff was seen for a refill of his Imitrex.

7. On October 17, 2000, during a psychiatric consultation, Plaintiff reported that he had anxiety due to his life circumstances. He felt he was unjustly convicted and dissatisfied with the circumstances in prisons, including were his bunk was located. He also described himself as "multi-drug dependent" for 25 years. He didn't think drugs should be illegal and indicated they enhanced his life.

8. On December 4, 2000, Plaintiff was seen in CCC and was feeling well. He indicated he had had some headaches, but said the Imitrex worked well when he needed it. He was to continue the use of Imitrex as needed and return to CCC in three months. Plaintiff was again seen in CCC on March 1, 2001, and was feeling well. He had not had any headaches for several weeks, so was to continue the Imitrex as needed. On May 15, 2001, Plaintiff saw psychiatry and refused an offer for medication.

9. On May 25, 2001, Plaintiff was seen in CCC. He said he had no migraines for three months, and had not used the Imitrex, but wanted to have it available to him. He was also concerned about not getting medication for his anxiety and was quite argumentative. On August 23, 2001, Plaintiff indicated he had used his Imitrex three times in the past month. He also indicated that if he caught them early, he was able to get good relief with the Imitrex. He was still not interested in treatment for his hepatitis C.

Monaco v. U.S. Department of Justice, et al.
Civil No. 03-1051 (JRT/RLE)

10. On November 21, 2001, Plaintiff was seen in CCC and was generally well, having only one migraine that quarter. He was to continue Imitrex as needed. On December 12, 2001, it was noted that Plaintiff was still refusing treatment for his hepatitis C. Plaintiff was again seen in CCC on February 14, 2002. He indicated his headaches were a bit more frequent, but that the Imitrex was still working. On April 2, 2002, Plaintiff was seen on an urgent basis by PA Peterson. He indicated he had been having 1-2 headaches a month, with nausea and photophobia (light sensitivity), which was increased in frequency. He appeared to be in no acute distress, but was offered Toradol, a non-experimental, non-narcotic pain medication, and Phenergan, a non-narcotic anti-nausea medication. Plaintiff refused these medications and requested to see the profile for Toradol. Plaintiff insisted that narcotics were the only thing that worked for him and became argumentative. He was given an idle from his work assignment.

11. On April 17, 2002, Plaintiff presented with concerns about several issues. He indicated that he was filing papers and making a formal complaint concerning the treatment of his migraines. He indicated Imitrex and aspirin were usually helpful, but sometimes he needed more. He was advised about injectable Toradol and Phenergan, but he wanted Tylenol with Codeine or a shot of Demerol. He also indicated he was depressed and anxious at times and that Dr. Wilson (Psychiatry) had suggested treatment, but he did not want it. Plaintiff was advised that he should try the Toradol and Phenergan injection if the Imitrex and aspirin were not adequate. I stressed that if Plaintiff was depressed, I would refer him to Psychiatry.

Monaco v. U.S. Department of Justice, et al.
Civil No. 03-1051 (JRT/RLE)

12. On May 10, 2002, Plaintiff was seen in CCC with no changes in his basic condition. Plaintiff was argumentative and claimed to use his Imitrex regularly. However, when Pharmacy was consulted, it was noted his last Imitrex was filled on February 19, 2002 (2 doses) and had not be filled since. Plaintiff also indicated he went about nine months between refills and used aspirin to supplement. Plaintiff still wanted narcotics for his headaches and said he was filing papers to try to get them. Plaintiff was seen in CCC on August 7, 2002. He was feeling well and had no migraines that quarter. He was to return for follow-up in three months and continue the Imitrex as needed. On September 29, 2002, Plaintiff was seen for a complaint of migraine headache. He claimed to have blurred vision and disorientation. He indicated that he wanted to "go on record" as refusing a Toradol injection and requesting Tylenol #3 or Demerol. He had no apparent disorientation and was very specific in his requests. Plaintiff refused a Toradol injection and at his request, was to continue Imitrex and aspirin. He was also given an idle for the rest of the day and advised to return to sick call in the morning if his headache continued. On October 1, 2002, Dr. Gray noted that Plaintiff had never tried Toradol, which is a very reasonable and appropriate medication for his condition, and usually quite effective.

13. On November 4, 2002, Plaintiff failed to show up for his scheduled CCC appointment, so it was rescheduled. His Imitrex and aspirin were renewed. On December 3, 2002, Plaintiff was seen in CCC. He was very hostile and angry and wanted to be seen in a different exam room because of the camera in the room. He claimed that he was suing because

he could not get narcotics for his headaches when he wanted them. Plaintiff also stated that he had been treated with narcotics for 40 years. He refused to consider trying Toradol because he felt it was experimental. Plaintiff also indicated that he did use the Imitrex and it helped some. He complained of wanting a different PA, and wanted a "witness" present when seen by a PA. Dr. Gray noted that he did not seem to accept the sick call procedures. He was encouraged to follow the rules to better assess his medical problems, and to try Toradol when his next severe headache was not relieved by Imitrex. On December 10, 2002, Plaintiff had still not expressed a desire for hepatitis C treatment.

14. On January 22, 2003, Plaintiff arrived at FPC Duluth. On intake screening, his current medical diagnoses included hepatitis C, migraine headaches, and gender identity issues. He also voiced concerns about depression. In a written Inmate Request to Staff directed to me on February 1, 2003, Plaintiff indicated that PA Espinal was very nice during his intake screening and took extra time with him because of his many medical issues, but he wanted to further address his soft shoe requirement. On February 24, 2003, Plaintiff reported to the Health Services Unit complaining of a migraine with visual disturbances. He did not have a headache at that time as he had used Imitrex 10 minutes prior to being evaluated. PA Polzin gave him an idle for the remainder of the day and advised him to lay down. He was advised to have his aspirin renewed at his CCC appointment, but he reported he had aspirin in his dorm. Plaintiff was insistent that Tylenol #3 be prescribed and that he was in [litigation] over the issue with his

previous institution. Plaintiff expressed concerns with taking straight Tylenol due to his hepatitis C, but expressed no such concern with the narcotic combination of Tylenol and Codeine.

15. On February 27, 2003, Plaintiff was seen in CCC for follow-up of his migraine headaches. He stated he had a severe headache early in the morning that day, but it went away after using Imitrex. He was alert and oriented, and did not show any visual disturbances, photophobia, facial flushing, nausea, vomiting, etc. Plaintiff's nasal spray was renewed to use as needed upon the onset of a migraine. Plaintiff requested an idle, however, PA Espinal declined his request due to the absence of symptoms. On February 27, 2003, Health Services Administrator DeFrance made an administrative entry which indicated Plaintiff had presented to his supervisor and stated he was having a migraine and could not work. While Plaintiff claimed to have pain of an "8" on a scale of 1-10, there were no signs physically found by the PA to indicate an active migraine. Plaintiff approached Mr. DeFrance in the present of his work supervisor and indicated that he felt it was wrong that he "be forced to return to work". He claimed that the day before he had experienced nausea and other symptoms due to what he felt were "fumes from vehicles, the smell of the garbage, and urea of fertilizer from whatever they were doing with the worms." He claimed it was to the point where he need to leave the building to get some fresh air. When asked if he had reported these symptoms to medical staff at that time, he indicated he had not. Mr. DeFrance informed Plaintiff that he was not being forced to return to work. Plaintiff asked Mr. DeFrance to override the clinical decision, however, Mr.

7

DeFrance informed him that his position was administrative and not clinical, and that he could enforce the decisions made, but not alter them. When Plaintiff was later getting his medication, he indicated that he was "going to return to work, even though it is a violation of my Constitutional Rights".

16. Since his arrival to FPC Duluth, the BOP changed the use of Imitrex nasal spray to an injectable form in order for staff to maintain better control over the medication. However, at no time was Plaintiff denied medication, and the injectable Imitrex was available to him as needed. On March 6, 2003, Plaintiff was seen in the Infectious Disease CCC. He complained about palpitations off and on, work conditions involving toxic fumes at his job site in the Safety Department, and his shoes not fitting. Plaintiff was argumentative and insistent that he be allowed to wear tennis shoes, be taken out of his current job, sent to a cardiologist, given a holter monitor, sent to a podiatrist, be prescribed Tylenol #3, and have a yearly echocardiography. He walked down the hall without any apparent limp. He was able to slip his orthotics into the low cut work shoes and they appeared to fit well. I spoke to Chuck Wessberg about any respiratory/pollution problems at Plaintiff's work site and he indicated that there were none, nor did I personally observe any physical symptoms which matched Plaintiff's complaints of respiratory/pollution problems at the recycling work site. At no time was Plaintiff deemed medically unable to work at this particular job site. It was also noted that the Plaintiff was not asthmatic. He had Imitrex for his headaches, and he was to return to the clinic as necessary.

Monaco v. U.S. Department of Justice, et al.
Civil No. 03-1051 (JRT/RLE)

17. On May 29, 2003, Plaintiff was seen in CCC and had one migraine the week before, with no nausea or vomiting. He was educated on proper rest in a dark room. Plaintiff was again seen in CCC on August 14, 2003. He indicated that his headaches were stable and that he was not taking medication for headaches. I noted that the plan was to discontinue follow-up in the Neurology CCC as Plaintiff no longer required such monitoring. Attached and incorporated by reference to this declaration as Attachment A is a true and accurate copy, kept in the ordinary course of business, of Plaintiff's Medical Record.

18. Furthermore, while Plaintiff does not profess to be a smoker, which can contribute to the development or worsening of headaches, commissary records indicate that he has purchased approximately 24 packs of cigarettes between May 27, 2003, and October 23, 2003. Attached and incorporated by reference to this declaration as Attachment B is a true and correct copy, kept in the ordinary course of business, of Plaintiff's Commissary Sales Records.

19. Plaintiff received appropriate treatment for his chronic migraine condition and other medical complaints. He was carefully monitored for his medical conditions, including treatment for his infrequent migraines. Dr. Gray, other BOP clinical staff, and I did not find the use of narcotic pain medication to be appropriate in his case. Moreover, neither Dr. Gray nor I found Plaintiff's chronic condition to be worsening in symptoms or frequency sufficient to warrant a change in his regimen or referral to a specialist. While Dr. Gray and I did consider Plaintiff's prior history, including his use of narcotics for migraines in the past, based upon his symptoms,

9

Monaco v. U.S. Department of Justice, et al.
Civil No. 03-1051 (JRT/RLE)


his history of drug addiction, and the effectiveness of Imitrex, it was determined narcotic medication was not clinically indicated. Additionally, while Plaintiff claims to have been treated with narcotics for the past 40 years, there is nothing in his medical record which suggests that he was ever provided narcotics by BOP staff. The medical record indicates there was an option for Tylenol with Codeine recommended by a consultant while Plaintiff was at Terminal Island, however, he was never provided that medication. There is also no evidence that Plaintiff's work assignment in the recycling center was detrimental to his health.

20. In accordance with the Federal Bureau of Prisons Clinical Practice Guidelines, which references the Cecil Textbook of Medicine, and the Mayo Clinic Examinations in Neurology, the use of narcotic medication is not a suggested treatment for migraine headaches. Attached and incorporated by reference to this declaration as Attachment C is a true and accurate copy, kept in the ordinary course of business, of the Federal Bureau of Prisons Clinical Practice Guidelines for the Management of Headaches, September 2003. Additionally, the Mayo Clinic website on the treatment of migraines, a recognized and authoritative resource, supports such treatment guidelines utilized by the BOP. The Mayo Clinic recommends the use of various non-narcotic drugs, including Sumitriptan, and indicates that the injectable form works faster than any other migraine-specific medication, in as little as 15 minutes, and is effective in 70-80 percent of cases. Attached and incorporated by reference to this declaration as Attachment D is a true and accurate

Monaco v. U.S. Department of Justice, et al.
Civil No. 03-1051 (JRT/RLE)

copy, obtained from the Mayo Clinic website (MayoClinic.com), of the Mayo Clinic Website Article on Migraine Treatment.

21. Providing Imitrex for Plaintiff's migraine headaches is an acceptable and reasonable treatment option based upon sound medical judgment. There are multiple therapies available for the treatment of migraines, and the use of narcotics is not among the suggested treatment guidelines. Additionally, the use of narcotics were avoided in Plaintiff's case, as his symptoms did not warrant such use, it is not a recommended treatment therapy for migraines, and Plaintiff had a history of drug abuse and addiction.

I declare under penalty of perjury pursuant to 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 31st day of October 2003.

Dr. Bruce Barton, Clinical Director
Federal Prison Camp
Duluth, Minnesota