## Closing Adjustments

7.1. Real estate taxes and water charges and sewer rents, if any, shall be apportioned and adjusted as of the date of closing.

## ARTICLE 8.

## Assessments

8.1. Optionor represents that as of the date of the within Contract, neither said Property nor any part thereof has been affected, or is affected, by an assessment or assessments which are or may become payable in annual installments, whether or not the first is then a charge or lien, or has been paid. In addition, to the best of Optionor's knowledge, there have been no unconfirmed assessments affecting said premises, with no ordinances having been adopted for improvements affecting the within premises, at or prior to, the date hereof, and no improvements or work have been commenced covering any improvements benefiting said premises as of the date hereof. As a result, in the event of any subsequent assessment or assessments, including unconfirmed assessments which may affect these premises and which may constitute a lien prior to closing, the same shall be borne by, and be the responsibility of, the Optionee. Optionee has sixty (60) days from the date of this Agreement to determine whether there is an assessment due or likely to be due. The Optionee must put the Optionor on notice within seventy-five (75) days from the date of this Agreement of any amounts due regarding same. Failure of Optionee to so inform Optionor within said seventy-five (75) day period of time shall relieve Optionor from all responsibilities for any assessments which were in existence or could reasonably have been known.

## ARTICLE 9.

## Violations

9.1. Optionor represents that at the date of this Agreement, there are no violations of the laws, ordinances, rules, or regulations of any governmental authority having jurisdiction of the Property, nor does Optionor have knowledge of any facts which if known by any such authority would cause a violation to be placed thereon, and any notice of violation affecting the Property at the date of exercise of the Option and/or the date of closing shall be complied with by Optionor, at its sole cost and expense, so that the Property shall be conveyed free of same. Optionor represents that it has not placed any hazardous waste or hazardous substances on or under the premises and, to the best of its knowledge, there are no hazardous wastes or hazardous substances on or under the premises and, to the best of its knowledge, there are no hazardous wastes or hazardous substances on or under the property, it being understood that the property has been utilized for farming and in the course thereof. If required, Optionor will sign any necessary letters or applications which may be required for compliance with the provisions of the applicable local, state and Federal environmental statutes and regulations. Optionor represents that the premises are not in a flood plain, watershed, or flood hazard area or zone. Optionee shall provide Optionor with notice of any toxic waste concerns or hazardous waste or

hazardous substance concerns within sixty (60) days of the date of this Agreement or same shall be deemed waived.

## ARTICLE 10.

### Broker

10.1. Optionor and Optionee represent and warrant to each other that no real estate broker shall receive a commission or other form of compensation upon the conveyances contemplated herein. If either party elects to utilize the service of a broker, it shall do so upon its own accord, and the other party shall not be obligated to pay for any service of the same.

## ARTICLE 11.

### Limitation of Liability

11.1. Optionee's liability for breach of this Agreement shall be limited to the Option Premium(s), as stated herein, which the parties agree shall constitute full and complete liquidated damages for any default hereunder by Optionee. Optionor agrees that it is obligated to specifically perform its obligations and duties, as stated herein and failure to do so, shall constitute a breach. Upon breach Optionee may be entitled to equitable remedies as well as any costs incurred, which may include but are not limited to those costs associated with site improvements, and option premiums paid to date.

## ARTICLE 12.

### Condemnation and Risk of Loss

12.1. If, during the pendency of this Option, or after its exercise but before closing, there shall be any condemnation proceedings or eminent domain proceedings pending or contemplated against the Property, affecting all or any portion thereof, or the access thereto or therefrom, or all or any portion of the Property or the access thereto or therefrom is affected by any map filed, or otherwise, the Optionor may, at its sole discretion (i) elect to be bought out for the principle cost of the remaining land and forfeit any future option premiums, by providing Ninety days written notice to Avidigm Capital Group, Inc., or (ii) proceed to closing as provided hereunder, in which latter event, all awards or settlements under any such proceedings, whether or not made prior to closing, shall become the property of Optionee, Optionor hereby assigning to Optionee any claim or interest therein, and Optionee hereby agreeing to execute any documents reasonably required in connection herewith after closing by Optionee. The provisions of this Article shall survive closing of title hereunder.

## ARTICLE 13.

### Other Covenants

13.1. Optionor agrees that Optionee may apply to the appropriate governmental authorities having jurisdiction thereof to secure subdivision approvals, site plan approvals, issuance of building permits, curb cut approvals, and various other approvals and permits, necessary or desirable for the development of the Property. Optionor agrees to execute all necessary documents and take all actions as shall be necessary, and otherwise cooperate with Optionee in connection with such applications. Optionor agrees that, in its absence or during times when it is unavailable, Jason E. Fischer, Esq. shall be authorized to review all applications and submissions for development approval and shall further be authorized to execute same as attorney in fact for the Optionor.

## ARTICLE 14.

### Notices

14.1. All notices hereunder shall be in writing and sent by United States registered or certified mail, postage prepaid, return receipt requested, to the parties at their respective addresses set forth above, or to such other addresses as either party may from time to time specify by appropriate notice hereunder. Specifically, copies of all notices to be sent to Optionor shall be mailed to its attorney, to wit:

Law Office of John C. Povejsil
John C. Povejsil, Attorney at Law
69 North Lake Street
Forest Lake, Minnesota 55025

and copies of all notices to be sent to Optionee shall be sent to its attorney, to wit:

Fischer, Fischer & Jeffery, LLC
Jason E. Fischer, Attorney at Law
8655 Eagle Point Boulevard
Lake Elmo, Minnesota 55042

14.2. All notices hereunder, including, without limitation, those notices whereby Optionee exercises its Option hereunder, shall be effective upon deposit of same into the United States Mails.

## ARTICLE 15.

### Exercise of Option No Waiver

15.1. Optionee's exercise of its Option hereunder shall not constitute a waiver by it of any of the terms and provisions hereunder, including, without limitation, the conditions as to title and as to the truth of Optionor's representations.

## ARTICLE 16.

## Recordation of Notice

16.1. Optionor and Optionee agree that the within Option shall not be recorded in the Kandiyohi County Clerk's Office prior to closing of title. However, in the event Optionee wishes to have a memorandum or notice of said Option made of record in the Kandiyohi County Clerk's Office at any time hereafter, it may do so in compliance with the provisions of a separate "Memorandum of Option executed by the parties and their attorneys and bearing even date herewith and attached as Exhibits B.

## ARTICLE 17.

### Binding Effect

17.1. This Agreement shall be binding upon the parties hereto and upon their respective heirs, administrators, successors, executors, legal representatives, and assigns.

17.2. Optionor and Optionee agree that Time is of the Essence for all dates set forth in this contract.

17.3. Except as specifically provided for herein, all of the representations and warranties contained in this Agreement and the Exhibits to this Agreement shall survive the Final Option Period for a period of twelve (12) months.

17.4. Upon the full performance of this agreement Optionor shall execute and deliver to Optionee a Quit Claim Deed for the entire tract(s) of the property, as defined herein.

17.5. A Discharge of Option Agreement within THIRTY (30) days of full performance shall be executed by the parties and their attorneys and bearing even date herewith and attached as Exhibits C, and made of record in the Kandiyohi County Clerk's Office.

## ARTICLE 18.

### Buy-out

18.1. Optionor shall have the right to demand that Optionee buy-out any property unpurchased at the time of said demand. Notice of Demand must be in writing and sent via United States Certified Mail to the attorney for Optionee, and not be made prior to January 1, 2005. The buy-out price shall be calculated as follows:

Option Premium shall be pro-rated through the date of closing, and shall be the amount as required in Article 3, et. seq., then reduced by Thirty percent (30%).

Optionee shall have Ninety (90) days from the date of receipt of Notice of Demand to buy back property, or Optionee will be in default.

# ARTICLE 19.

## Miscellaneous

19.1. Optionee agrees to give over to Optionor all engineering documents, EFS, and other papers prepared by Optionee, used in its application to obtain its approvals, in the event there is no closing of title.

19.2. This Option shall be interpreted under the laws of the state of Minnesota.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed on the day and year set forth above. This document may be executed in counter-parts and/or by facsimile.

Country Square Apartments, LLC

Dated: _7-29-04_

By: _Senn_

Its: _MEMBER_

State of _WI_ )
                          )ss
County of _Washington_ )

Charles Senn personally came before me this 29th day of July, 2004, to me known to be the person who executed this instrument and acknowledged the same.

_____
NOTARY PUBLIC

Jason E. Fischer, his successors and/or assigns

Dated: _7-30-04_

By: _____

Its: _____

State of _Minnesota_ )
                          )ss
County of _Scott_ )

Jason Fischer personally came before me this 30th day of July, 2004, to me known to be the person who executed this instrument and acknowledged the same.

_____
NOTARY PUBLIC

> COLLEEN A. TURGEON
> Notary Public
> Minnesota
> My Commission Expires January 31, 2009

# EXHIBIT A

## Schedule of Real Estate – Agassiz Ridge

### Fischer (Seller) to Country Square Apartments LLC (Buyer)

|     | Lot | Block | Price | Lake Frontage |
|-----|-----|-------|-------|---------------|
| 1.  | 5   | 1     | $37,500.00  | No  |
| 2.  | 6   | 1     | $37,500.00  | No  |
| 3.  | 7   | 1     | $37,500.00  | No  |
| 4.  | 8   | 1     | $37,500.00  | No  |
| 5.  | 1   | 2     | $100,000.00 | Yes |
| 6.  | 2   | 2     | $120,000.00 | Yes |
| 7.  | 8   | 2     | $120,000.00 | Yes |
| 8.  | 9   | 2     | $160,000.00 | Yes |
| 9.  | 10  | 2     | $170,000.00 | Yes |
| 10. | 11  | 2     | $170,000.00 | Yes |
| 11. | 12  | 2     | $160,000.00 | Yes |
| 12. | 14  | 2     | $100,000.00 | Yes |
| 13. | 15  | 2     | $100,000.00 | Yes |
| 14. | 16  | 2     | $100,000.00 | Yes |

Total Purchase Price    $1,450,000.00

Exhibit 9

## EXCHANGE AGREEMENT
## BETWEEN COUNTRY SQUARE APARTMENTS, LLC AND
## INRE TITLE, A MINNESOTA LIMITED LIABILITY CORPORATION
## (DIRECT DEED)

This Exchange Agreement is made and entered into this 11 day of October, 2005, by and between Country Square Apartment, LLC, a Wisconsin limited liability company ("Exchangor"), and INRE Title, LLC, a Minnesota limited liability company ("Intermediary").

WHEREAS, Exchangor and Avidigm Capital Group, Inc., a Minnesota corporation ("Purchaser") have entered into a Real Estate Purchase and Sale Agreement ("Purchase Agreement"), wherein Exchangor agreed to sell and Purchaser agreed to buy certain real property located in Minnesota (See Exhibit A, hereinafter the "Relinquished Property"); and

WHEREAS, Exchangor desires to engage in a tax deferred exchange of the Relinquished Property and intends to transfer its interest in the Relinquished Property according to the terms of this Exchange Agreement so as to qualify the transfer as a deferred like-kind exchange within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"); and

WHEREAS, Exchangor is willing to close the transfer of the Relinquished Property according to the terms of the Purchase Agreement and this Exchange Agreement and Intermediary agrees to act as a "qualified intermediary" within the meaning of Treasury Regulation § 1.1031(k)-1(g)(4), and in connection therewith Intermediary is willing to accept and hold the proceeds of said closing pursuant to this Exchange Agreement and the assignment to Intermediary by Exchangor of Exchangor's interest in the Purchase Agreement, as hereinafter set forth, and to use said proceeds to complete the acquisition by Exchangor hereafter of designated replacement property to be subsequently identified by Exchangor in order to complete the deferred like-kind exchange contemplated herein, according to the terms and conditions of this Exchange Agreement.

NOW, THEREFORE, for valuable consideration, the parties hereto agree as follows:

1.      Exchangor agrees to transfer the Relinquished Property to Intermediary in consideration of, and in exchange for, the transfer by Intermediary to Exchangor of other property or properties of like-kind to be identified by Exchangor and acquired by Intermediary pursuant to Paragraphs 5 and 6 hereof. Intermediary agrees to acquire the Relinquished Property from Exchangor pursuant to this Agreement and transfer the Relinquished Property to Purchaser in accordance with the terms and conditions of the Purchase Agreement. For this purpose, Exchangor hereby assigns to Intermediary, and Intermediary hereby accepts, all of Exchangor's rights, title and interest in the Purchase Agreement, but not Exchangor's obligations, and the Relinquished Property, as evidenced by the Assignment in the form appended hereto as Exhibit B. Intermediary shall provide notice of such assignment to the Purchaser prior to the transfer of the Relinquished Property to the Purchaser. Notwithstanding the foregoing, at closing Exchangor shall convey the legal title to the Relinquished Property to Purchaser at the direction of Intermediary as evidenced by the Direct Deeding Instructions - Relinquished Property in the form appended hereto as Exhibit E and according to the terms and conditions of the Purchase Agreement,

and Purchaser shall transfer to Intermediary, pursuant to the foregoing Assignment, all the proceeds of sale which would have been due and payable at closing to Exchangor (the "Replacement Proceeds"), but for the Assignment. Intermediary shall thereafter hold, maintain and use the Replacement Proceeds pursuant to the terms and conditions of this Exchange Agreement. Exchangor and Intermediary acknowledge and agree that, with respect to all matters other than the conveyance of the Relinquished Property and the payment of the proceeds to Intermediary, the Purchaser's rights under the Purchase Agreement against Exchangor and Exchangor's rights under the Purchase Agreement against the Purchaser shall survive the assignment of the Purchase Agreement just as if this Exchange Agreement did not exist.

      2.     Intermediary shall be the escrow holder for the processing of the exchange and sale of the Relinquished Property. All costs of escrow and all transfer taxes and other closing costs incurred on the transfer of the Relinquished Property to Intermediary, and all such costs incurred by Intermediary upon its subsequent transfer of the Relinquished Property to Exchangor, shall be the responsibility of Exchangor. All property taxes, insurance premiums, rents, and interest on the Relinquished Property shall be pro-rated as of close of escrow, the amounts of which will be set forth in a closing statement. Exchangor shall maintain or cause to be maintained adequate insurance in an amount no less than the value of the Relinquished Property which insurance shall not expire sooner than the close of escrow.

      Intermediary shall use a portion of the Replacement Proceeds received by it from the Purchaser of the Relinquished Property to satisfy any and all indebtedness encumbering said Relinquished Property and to pay any transactional items (such as commissions, prorated taxes, recording or transfer taxes, and title company fees) that are described in Treasury Regulation § 1.1031(k)-1(g)(7). Intermediary shall deposit and invest all the remaining proceeds of sale received by it in a federally insured financial institution selected by it in its discretion. Intermediary shall not be responsible for maximizing the yield on the Replacement Proceeds. Any and all interest and earnings shall be added to the Replacement Proceeds and shall become a part thereof, and shall be subject to the restrictions contained in Paragraphs 3 and 4 hereof. Interest will be treated as interest, regardless of whether it is paid to the Exchangor in cash or in property, including property of a like kind. Exchangor understands that Exchangor must include the interest in income according to Exchangor's method of accounting.

      It is the intent of the parties hereto that the Replacement Proceeds be used solely to enable Intermediary to perform its obligations to acquire Replacement Property and shall not be deemed a part of INRE Title's general assets nor subject to claims by INRE Title's creditors.

      3.     Exchangor has no rights, except as may be provided in Paragraphs 4 and 5 herein to receive, pledge, borrow or otherwise obtain the benefits of the Replacement Proceeds or other money or property.

2

4.    If Exchangor has not identified replacement property within the manner set forth in Paragraph 5 hereinbelow by the end of the Identification Period (as defined in Treasury Regulation § 1.1031(k)-1(b)(2)), Exchangor may receive, pledge, borrow or otherwise obtain the benefits of the Replacement Proceeds, including the interest and earnings thereon, at any time after the end of said Identification Period. If Exchangor has identified Replacement Property in a timely manner as set forth in Paragraph 5 hereinbelow, Exchangor may receive, pledge, borrow or otherwise obtain the benefits of the Replacement Proceeds, including the earnings thereon, upon or after the receipt by Exchangor of all of the Replacement Property to which Exchangor is entitled under this Exchange Agreement. Intermediary agrees to use so much of the Replacement Proceeds, including the earnings thereon, as is necessary to acquire and receive the Replacement Property before the end of the Exchange Period, as defined in Treasury Regulation § 1.1031(k)-1(b)(2). If Exchangor does not identify a Replacement Property within the Identification Period (i.e., 45 days after the date the Relinquished Property is transferred) or if Intermediary holds any portion of the Replacement Proceeds under the provisions of this Exchange Agreement on the date which is the first day after the end of the Exchange Period, Intermediary promptly shall distribute the Replacement Proceeds, including any earnings thereon, to Exchangor or to such other person or entity that Exchangor may designate. It is intended that the foregoing conditions be interpreted and imposed in a manner consistent with the limitations contained in Treasury Regulation § 1.1031(k)-1(g)(6).

5.    Exchangor shall have the right to identify a Replacement Property qualifying under Section 1031 within the Identification Period. Such identification shall occur only if the Replacement Property is designated in a written document in substantially the same form as attached hereto as Exhibit C signed by Exchangor and hand-delivered, mailed, telecopied, or otherwise sent before the end of the Identification Period to Intermediary. Any such identification may be revoked by written notice from Exchangor to Intermediary prior to the end of the Identification Period. In addition, in accordance with Treasury Regulations, any Replacement Property received by Exchangor within the Identification Period will be treated as identified. Exchangor may not identify as Replacement Property any property that fails to qualify as like-kind property within the meaning of Section 1031 of the Code.

Exchangor shall unambiguously describe the Replacement Property using either its: i) complete legal description; ii) complete street address; or iii) distinguishable name. Exchangor shall identify only that number or value of Replacement Properties which meets one of the following criteria: i) three (3) Replacement Properties without regard to the fair market value of the properties ("Three Property Rule"); or ii) any number of properties as long as their aggregate fair market value as of the end of the Identification Period does not exceed 200% of the aggregate fair market value of the Relinquished Property as of the date the Relinquished Property was transferred by Exchangor ("200% Percent Rule").

6.    Exchangor intends to execute a purchase agreement, as agent for a disclosed principal, Intermediary, with respect to the Replacement Property to be identified pursuant to Paragraph 5 hereof (for purposes of this Exchange Agreement, the "Replacement Property"). Exchangor agrees to assign, and Intermediary agrees to accept, all of

3

Exchangor's rights, interest and title, but not Exchangor's obligations, in said agreement and in the Replacement Property as evidenced by an Assignment in the form appended hereto as Exhibit D, and Intermediary agrees thereafter to acquire the Replacement Property in a purchase transaction and transfer the Replacement Property to Exchangor in consideration of and in exchange for the Relinquished Property. Intermediary shall provide notice of such assignment to the third party seller of the Replacement Property in the form appended hereto as Exhibit D prior to the transfer of the Replacement Property to Exchangor. The conveyance of the Replacement Property by Intermediary to Exchangor may be effected by Intermediary instructing the seller of said property to deliver a deed therefor directly to Exchangor, as evidenced by executing Direct Deeding Instructions - Replacement Property in the form appended hereto as Exhibit F. Exchangor and Intermediary acknowledge and agree that, with respect to all matters other than the conveyance of the Replacement Property and the payment of the proceeds to the seller, the purchaser's rights under the Replacement Property purchase agreement against Exchangor and Exchangor's rights under the such agreement against the seller shall survive the assignment of the purchase agreement just as if this Exchange Agreement did not exist.

The parties contemplate that the Exchangor will incur, assume or take Replacement Property subject to indebtedness with respect thereto in an amount equal to or greater than the amount of indebtedness, if any, that encumbered the Relinquished Property immediately before the transfer to Intermediary of the Relinquished Property. If funds in addition to the Replacement Proceeds are required to complete the acquisition of the Replacement Property, Exchangor shall transfer or cause the transfer of such additional funds to Intermediary as and when required. Intermediary shall not be required to assume any loan on any Replacement Property or to execute any promissory notes or other evidence of indebtedness in connection with such acquisitions which would impose any liability on Intermediary or its directors, officers, employees or agents.

7. The duties and obligations of INRE Title are limited to those expressly set forth herein and no implied duties or obligations shall be read into this Exchange Agreement. INRE Title shall not be liable for any act or omission by it made in good faith so long as Exchangor has consented to or directed such act or omission.

Intermediary shall not be required to execute any document that would impose any personal liability upon Intermediary or its directors, officers, employees or agents. Intermediary shall have no obligation to execute any documents unless Exchangor has approved the documents in writing. Intermediary shall have no liability for the sufficiency, accuracy, or validity of documents. Intermediary shall have no obligation to sell the Relinquished Property or purchase the Replacement Property unless Intermediary is a party to the purchase and sale agreements with respect to said properties or said agreements have been assigned to Intermediary in a form that meets its approval. Intermediary shall not be required to execute any agreement or participate in any transaction that, in the sole judgment of Intermediary would require Intermediary to engage in any unlawful or fraudulent action. In the event of a default by Purchaser under the Purchase Agreement or by seller under the Replacement Property purchase agreement, Intermediary may take such action as it deems necessary or appropriate, in its

4

sole and absolute judgment, to provide for the enforcement of such agreement, by or on behalf of Exchangor. Should Intermediary take steps necessary to enforce such agreement after said default, all costs and expenses, including but not limited to, court costs and attorney's fees incurred by Intermediary shall be paid by Exchangor.

8. **EXCHANGOR ACKNOWLEDGES AND AGREES THAT IT HAS RELIED SOLELY UPON THE ADVICE AND JUDGMENT OF ITS OWN INDEPENDENT TAX ADVISORS, TAX ATTORNEYS, AND/OR CERTIFIED PUBLIC ACCOUNTANTS AS TO THE TAX CONSEQUENCES AND IMPLICATIONS OF THE TRANSFERS, CONVEYANCES AND EXCHANGE OF THE RELINQUISHED PROPERTY AND THE REPLACEMENT PROPERTY UNDER THE PURCHASE AGREEMENT, THIS EXCHANGE AGREEMENT, THE ASSIGNMENT AND ANY AGREEMENT RELATING TO THE REPLACEMENT PROPERTY. EXCHANGOR HAS NOT RELIED UPON ANY CONVERSATIONS WITH OR ADVICE FROM [QUALIFIED INTERMEDIARY] REGARDING SUCH TAX CONSEQUENCES AND IMPLICATIONS AND FULLY INDEMNIFIES AND HOLDS INRE TITLE HARMLESS FROM ANY LOSS WHICH IT MAY SUSTAIN IN THE EVENT THIS TRANSACTION IS DETERMINED NOT TO QUALIFY AS A LIKE-KIND EXCHANGE WITHIN THE MEANING OF SECTION 1031 OF THE CODE.**

9. Notwithstanding anything to the contrary contained herein or in any other document executed in connection herewith, Exchangor hereby indemnifies and holds INRE Title, its successors and assigns, harmless from and against any and all liabilities, damages, suits, actions, penalties, costs, claims, expenses and fees (including court costs and reasonable attorneys fees), foreseen or unforeseen, incurred by or asserted against INRE Title, its successors or assigns, in any way, whatsoever, arising out of or relating to the transfer by Exchangor of the Relinquished Property or the acquisition by Exchangor of Replacement Property or the execution by INRE Title of any documents or instruments relating to the Relinquished Property, the Replacement Property (including any attempt to acquire the same), or any transaction contemplated herein. Exchangor further indemnifies and holds INRE Title, its successors and assigns, harmless from and against any and all demands, assessments, liabilities, damages, suits, actions, penalties, costs, claims, expenses and fees (including court costs and reasonable attorneys fees), foreseen or unforeseen, incurred by the Exchangor in the event the Internal Revenue Service challenges or disallows the treatment of the exchange as a like-kind exchange of real property within Section 1031 of the Code. Notwithstanding the foregoing, Exchangor shall not indemnify or hold INRE Title harmless for any claims arising out of the gross negligence or willful misconduct of INRE Title or any other person to be indemnified. Exchangor hereby agrees, at INRE Title's request, to defend INRE Title against any such liabilities, damages, suits, actions, penalties, costs or claims for which Exchangor agrees to indemnify and hold INRE Title harmless, with counsel selected by INRE Title and approved by Exchangor, which approval shall not be unreasonably withheld or delayed. It is expressly understood and agreed by the parties that this indemnity by Exchangor shall not constitute a waiver by Exchangor of any claim it may

5

have against INRE Title for INRE Title's failure properly to perform and discharge its obligations under this Exchange Agreement. This paragraph shall survive the closing of the transactions contemplated hereby.

10.　　This Exchange Agreement inures to the benefit of and binds all parties hereto, their successors and assigns. Neither party may assign its rights under this Exchange Agreement without the written consent of the other party, which may be withheld for any reason.

11.　　This Exchange Agreement is intended to further the purpose of the parties to effect a like-kind exchange of property in compliance with Section 1031 of the Code and is to be construed consistently with that purpose. If any provision of this Exchange Agreement is inconsistent with or contrary to that purpose, not in compliance with Section 1031 of the Code, or otherwise unenforceable or invalid, this Exchange Agreement shall be construed to exclude or to modify said provision to the extent necessary in order to satisfy the intended purpose of this Exchange Agreement.

12.　　Intermediary is not, and shall not be deemed to be, an agent of Exchangor by entering into this Exchange Agreement or by reason of the assignments contemplated herein or receipt by it of the Replacement Proceeds from its sale of the Relinquished Property. It is the intent of the parties that Intermediary shall be a qualified intermediary within the meaning of Treasury Regulations § 1.1031(k)-1(g)(4).

13.　　This Exchange Agreement constitutes the entire agreement among the parties hereto and may be modified or amended only by a written instrument executed by all the parties. This Exchange Agreement may be executed in one or more counterparts, all of which together shall constitute one agreement.

14.　　Intermediary shall be paid a qualified intermediary fee in the amount of $1,000.00.

15.　　The terms of this Exchange Agreement shall survive the close of escrow and delivery of the deed to the Relinquished Property to the Purchaser.

6

16.  All notices required or permitted to be given pursuant to this Exchange Agreement shall be in writing and shall be effective upon (i) personal delivery to the party to whom they are addressed; (ii) if telecopied, upon receipt of confirmation that successful facsimile transmission has occurred; or (iii) if mailed, upon delivery to the party to whom they are addressed by postage prepaid registered or certified mail.  Notices shall be addressed to the following:

     TO:         INRE Title, LLC
                     8655 Eagle Point Blvd
                     Lake Elmo, MN 55042

     TO:         Country Square Apartments, LLC
                     2145 Country Square Lane
                     Richfield, WI 53076

17.  This Exchange Agreement shall be governed by and interpreted under the laws of the State of Minnesota.

18.  This Exchange Agreement may be executed in counterparts and shall be binding on all the parties hereto as if one agreement had been signed.  Transmittal and receipt of a facsimile copy of this Agreement with facsimile signatures shall be binding on the parties hereto with the originally signed document to be delivered subsequently via regular mail or overnight delivery.

DATED: October 11, 2005

INRE Title

By: _____
Jason E. Fischer

Its: Managing Member

DATED: October 11, 2005

Country Square Apartments

By: _____
Charles W. Senn

Its: Managing Member

7

## EXHIBIT A

### Legal Description of Relinquished Property

PARCEL 1:
Government Lots 1 and 2 of Section 16, Township 121, Range 33, Kandiyohi county, Minnesota.


PARCEL 2:
That part of the E½ of the NE¼ of Section 20, Township 121, Range 33, described as follows: Beginning at the Northeast corner of said Section 20; thence on a geodetic bearing of N 89°49'00" W, along the North line of said Section 20, a distance of 605.72 feet; thence on a bearing of S 1°43'31" W a distance of 649.50 feet; thence on a bearing of N 89°49'00" W a distance of 78.60 feet; thence on a bearing of S 2°03'16" W a distance of 1981.36 feet to the South line of the NE¼ of said Section 20; thence on a bearing of S 89°10'54" E, along the South line of the NE¼ of said Section 20, a distance of 680.39 feet to the Southeast corner of the NE¼ of said Section 20; thence on a bearing of N 2°03'16" E, along the East line of the NE¼ of said Section 20, a distance of 2638.51 feet to the point of beginning, Kandiyohi county, Minnesota.

## EXHIBIT B

## ASSIGNMENT OF RELINQUISHED PROPERTY CONTRACT

FOR VALUE RECEIVED, the undersigned (the "Exchangor"), hereby transfers, sets over and assigns all its rights, title and interest in and to (i) that certain real property legally described on Exhibit A attached hereto (the "Relinquished Property") and (ii) that certain Purchase Agreement dated October 11, 2005, relating to the Relinquished Property, to INRE Title, (the "Assignee").

EXCHANGOR:

Country Square Apartments

By: _Senn_____

      Charles W. Senn

Its: Managing Member

## ACCEPTANCE

The undersigned, INRE Title, Assignee, hereby accepts this Assignment this 30 day of July, 2004.

ASSIGNEE:

INRE Title

By: _____

      Jason E. Fischer

Its: Managing Member

9

## EXHIBIT B (CONT.)

## NOTICE OF ASSIGNMENT

Jason Fischer, Exchangor, hereby notifies Country Square Apartments, LLC, Purchaser of the Relinquished Property, that Exchangor has assigned its right, title and interest in and to (i) the Relinquished Property and (ii) the Purchase Agreement relating to the Relinquished Property, dated October 11, 2005, from Exchangor to INRE Title, pursuant to a Section 1031 Exchange Agreement dated October 11, 2005.

EXCHANGOR:
Country Square Apartments

By: _____
        Charles W. Senn

Its: Managing Member

DATED: October 11, 2005

INRE Title, hereby acknowledges that it has delivered a copy of this Notice of Assignment to the Purchaser of the Relinquished Property.

INRE Title
By: _____
        Jason E. Fischer

Its: Managing Member

10

Exhibit 10

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | B. Type of Loan | | | |
|---|---|---|---|---|
| | 1. [ ] FHA | 2. [ ] FMHA | 3. [X] Conv. Unins. | |
| | 4. [ ] VA | 5. [ ] Conv. Ins. | | |
| | 6. File Number 258888 | | 7. Loan Number | |
| **Settlement Statement** | 8. Mortgage Ins. Case No. | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

D. Name of Borrower: Avidigm Capital Group, Inc., 8653 Eagle Point Blvd, Lake Elmo, MN 55042

E. Name of Seller: INRE Title, LLC as intermediary for Country Square Apartments, LLC, 8655 Eagle Point Blvd, Lake Elmo, MN 55042

F. Name of Lender: Investment Lending Group, LLC, 15808 Venture Lane, Eden Prairie, MN 55344

G. Property Location: Pt Sec 16-121-33; Pt Sec 20-121-33...

Spicer, MN

H. Settlement Agent: Land Title, Inc. (651) 638-1900       41-1523253
   Place of Settlement: 15808 Venture Lane, Eden Prairie, MN 55344

I. Settlement Date: 10/11/2005       Proration Date: 10/11/2005

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross amount due from borrower: | | 400. Gross amount due to seller: | |
| 101. Contract sales price | | 401. Contract sales price | 887,311.50 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. Association Dues | | 409. Association Dues | |
| 110. Rent | | 410. Rent | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross amount due from borrower: | | 420. Gross amount due to seller: | 887,311.50 |
| 200. Amounts paid by or in behalf of borrower: | | 500. Reductions in amount due to seller: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes   7/1/2005   to 10/11/2005 | | 511. County taxes   7/1/2005   to 10/11/2005 | 152.02 |
| 212. Assessments | | 512. Assessments | |
| 213. Association Dues | | 513. Association Dues | |
| 214. Rent | | 514. Rent | |
| 215. | | 515. | |
| 216. | | 516. READ AND APPROVED | |
| 217. | | 517. BY: *[signature]* | |
| 218. | | 518. Country Square Apartments, LLC | |
| 219. | | 519. | |
| 220. Total paid by/for borrower: | | 520. Total reduction in amount due seller: | 152.02 |
| 300. Cash at settlement from/to borrower: | | 600. Cash at settlement to/from seller: | |
| 301. Gross amount due from borrower (line 120) | | 601. Gross amount due to seller (line 420) | 887,311.50 |
| 302. Less amount paid by/for borrower (line 220) | | 602. Less total reduction in amount due seller (line 520) | 152.02 |
| 303. CASH [ ]FROM [X]TO BORROWER | | 603. CASH [X]FROM [ ]TO SELLER | 887,159.48 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 406-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. SELLER INSTRUCTION - If this real estate was your principal residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 8252 and/or Schedule D (Form 1040).

You are required by law to provide Land Title, Inc. (651) 638-1900 with your correct taxpayer identification number.

If you do not provide Land Title, Inc. (651) 688-1900 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

QS 10-11-05

| | L. Settlement Charges | 10/11/05 10:22 AM | File Number: 258888 | |
|---|---|---|---|---|
| | | | **Paid From Borrower's Funds at Settlement** | **Paid From Seller's Funds at Settlement** |
| 700. | Total sales/broker commission | | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | $ | | | |
| 702. | $ | | | |
| 703. | Commission paid at settlement | | | |
| 704. | | | | |
| 705. | Broker Administrative Fee | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee          to   Investment Lending Group, ( 1.5%) | | | |
| 802. | Loan discount | | | |
| 803. | Appraisal fee | | | |
| 804. | Credit report | | | |
| 805. | Lender's Inspection fee | | | |
| 806. | Mortgage Insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Commitment Fee | | | |
| 809. | Underwriting Fee | | | |
| 810. | Flood Certification Fee | | | |
| 811. | Yield Spread Premium | | | |
| 812. | Tax Service Fee | | | |
| 813. | Broker Fee          to   Alternative Mortgage Options | | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from | | | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for | | | |
| 904. | | | | |
| 905. | VA Funding Fee | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard Insurance | | | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | Aggregate Adjustment | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee          to   Land Title, Inc. | | | |
| 1102. | Abstract or title search          to   Land Title, Inc. | | | |
| 1103. | Title examination          to   Land Title, Inc. | | | |
| 1104. | Title insurance binder | | | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to | | | |
| | Includes above items no.: | | | |
| 1108. | Title insurance          to   Land Title, Inc. | | | |
| | Includes above items no.:          Builder Rate | | | |
| 1109. | Lender's coverage          $1,050,000.00          $1,440.00 | | | |
| 1110. | Owner's coverage          $887,511.50 | | | |
| 1111. | Name Search & Review Surcharge to   Land Title, Inc. | | | |
| 1112. | Assessment Search & Review Sur to   Land Title, Inc. | | | |
| 1113. | ARM/Balloon Endorsement | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees:          Deed $46.00  Mortgage $46.00 | | | |
| 1202. | City/county tax/stamps:          Mortgage $2415.00 | | | |
| 1203. | State tax/stamps:          Deed $2926.13 | | | |
| 1204. | Assignment of Mortgage | | | |
| 1205. | Conservation Fee | | | |
| 1206. | Recording Surcharge          to   Land Title, Inc. | | | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey | | | |
| 1302. | Pest inspection | | | |
| 1303. | Plat Drawing & Review Surcharge | | | |
| 1304. | Priority Underwriting          to   Land Title, Inc. | | | |
| 1305. | Messenger/service fee | | | |
| 1306. | 2nd 1/2 2005 Taxes 21-018-0100  to   Kandiyohi County | | | |
| 1307. | 2nd 1/2 2005 Taxes 21-020-0022  to   Kandiyohi County | | | |
| 1308. | | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | | |

READ AND APPROVED

BY: _Mem_

Country Square Apartments, LLC

*[handwritten in right margin]* QA - 10-11-05

CERTIFICATION: I hereby carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

SELLER'S AND/OR PURCHASER'S STATEMENT Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that if the taxes payable in the year of closing are unavailable the prorations were based on taxes for the preceding year, or estimates for the current year. The proration figures are final. Neither party will look to each other or Title Company for adjustments after closing.

The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

_____
Avidigm Capital Group, Inc.

_____
INRE Title, LLC as intermediary for Country Square Apartments, LLC

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
Land Title Co. (651) 638-1900

$10-11-05$
_____
Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

READ AND APPROVED
BY: _____
Country Square Apartments, LLC

Exhibit 11

**A. Settlement Statement**

U.S. Department of Housing
and Urban Development

HUD-1 (3/86)  OMB No. 2502-0265

**B. Type of Loan**

| | |
|---|---|
| 1. ☐ FHA  2. ☐ FmHA  3. ☐ Conv. Unins. | 6. File Number  F3818A |
| 4. ☐ VA  5. ☐ Conv. Ins. | 7. Loan Number |
| | 8. Mortgage Insurance Case Number |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| Country Square Apartments, LLC<br>2145 Country Square Lane<br>Richfield , WI | Accredited Financial Services, Inc. | Cash transacation |

| G. Property Location | H. Settlement Agent |
|---|---|
| 17381 195th Avenue  *1,450,000*<br>Hawick, MN 56273  *2,300,000* | JOHN C. POVEJSIL - ATTORNEY |

| | | | I. Settlement Date |
|---|---|---|---|
| | Place of Settlement | | 11/04/05 |
| | 69 North Lake Street  Suite 14<br>Forest Lake , MN 55025 | | |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | 864,000.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 0.00 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes   11/05/05 to 12/31/05 | | 407. County taxes   11/05/05 to 12/31/05 | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. 2005 taxes poc in full | | 411. 2005 taxes poc in full | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 864,000.00 | **420. Gross Amount Due To Seller** | |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | 0.00 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan<br>        Taxes | |
| 206. | | 506. Hoffenkamp | |
| 207. | | 507. Closing Costs | |
| 208. | | 508. Judgment | |
| 209. | | 509. Mortgage Payoff | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. 1st buyer Closing Costs | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 0.00 | **520. Total Reduction Amount Due To Seller** | |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | 864,000.00 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | ( 0.00) | 602. Less reductions in amt. due seller (line 520) | |
| **303. Cash   ☒ From   ☐ To Borrower** | 864,000.00 | **603. Cash   ☐ To   ☐ From Seller** | |

| 700. Total Sales/Broker's Commission based on price $ @ % = | | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at Settlement | | | | |
| 704. | | | | |
| **800. Items Payable In Connection With Loan** | | | | |
| 801. Loan Origination Fee | % | | | |
| 802. Loan Discount | % | | | |
| 803. Appraisal Fee | to | | | |
| 804. Credit Report | to | | | |
| 805. Lender's Inspection Fee | | | | |
| 806. Mortgage Insurance Application Fee to | | | | |
| 807. Assumption Fee | | | | |
| 808. | | | | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |
| 812. | | | | |
| 813. | | | | |
| 814. | | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | |
| 901. Interest from to @ $ /day | | | | |
| 902. Mortgage Insurance Premium for months to | | | | |
| 903. Hazard Insurance Premium for years to | | | | |
| 904. years to | | | | |
| 905. | | | | |
| **1000. Reserves Deposited With Lender** | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | |
| 1002. Mortgage Insurance | months @ $ | per month | | |
| 1003. City property taxes | months @ $ | per month | | |
| 1004. County property taxes | months @ $ | per month | | |
| 1005. Annual assessments | months @ $ | per month | | |
| 1006. | months @ $ | per month | | |
| 1007. | months @ $ | per month | | |
| 1008. Aggregate adjustment | months @ $ | per month | | |
| **1100. Title Charges** | | | | |
| 1101. Settlement or closing fee | to John C. Povejsil | | | |
| 1102. Abstract or title search | to MLLC | | | |
| 1103. Title examination | to MLLC | | | |
| 1104. Title insurance binder | to | | | |
| 1105. Document preparation | to MLLC | | | |
| 1106. Notary fees | to | | | |
| 1107. Attorney's fees | to | | | |
| (includes above items numbers: | | ) | | |
| 1108. Title insurance | to MLLC | | | |
| (includes above items numbers: | | ) | | |
| 1109. Lender's coverage | $ | | | |
| 1110. Owner's coverage | $ | | | |
| 1111. Recording Service Fee to MLLC | | | | |
| 1112. Name Plat Assess Search to MLLC | | | | |
| 1113. | | | | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Recording fees: Deed $46.00 | ; Mortgage $ | ; Release $ | | |
| 1202. City/county tax/stamps: Deed $ | ; Mortgage $ | | | |
| 1203. State tax/stamps: Deed $2,851.20 | ; Mortgage $ | | | |
| 1204. Recording of Option | | | | |
| 1205. | | | | |
| **1300. Additional Settlement Charges** | | | | |
| 1301. Survey | to | | | |
| 1302. Pest inspection to | | | | |
| 1303. | | | | |
| 1304. | | | | |
| 1305. | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | 0.00 | |

I have carefully reviewed this Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Settlement Statement.

Borrower(s) _Glenn — CHIEF MANAGER_ 11/04/05 Seller(s)
Country Square Apartments, LLC

The Settlement Statement which I have prepared is a true and accurate account of funds received and funds disbursed or to be disbursed for this transaction.

11/04/05 _____ Minnetitle, L.L.C., Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Exhibit 12

## OPTION AGREEMENT TO PURCHASE REAL PROPERTY

**THIS AGREEMENT** made this _4_ day of _November_ 2005, by and between Country Square Apartments, LLC, hereinafter referred to as OPTIONOR and Avidigm Capital Group, Inc., hereinafter referred to as OPTIONEE.

It is the intention of the parties to this Option Agreement (the "Agreement") that Optionor shall sell and Optionee shall purchase the entire property described herein. The property may be purchased in increments, in a manner consistent with the terms and conditions of this agreement.

Although this agreement contains language setting forth options for both parties, it is the intent of both parties that is agreement shall contain the full force and effect of a purchase agreement for real property.

### WITNESSETH:

### ARTICLE 1.

### Term of Option

1.1    Optionor, for and in valuable consideration to be paid by Optionee to Optionor, and in consideration of the covenants and agreements herein contained, does hereby give, grant, and convey to Optionee the sole and exclusive right and option to purchase that certain parcel located in the County of Kandiyohi, State of Minnesota (the "Option"), legally described as:

*See Attached Exhibit A,*

containing approximately 108 acres of land, more or less (the Property), on the terms and conditions hereinafter set forth. Said Property is referred to in a certain title insurance commitment issued by Old Republic Title Insurance Company, Title No. _F 3818_ .

1

1.2     Said Option shall be exercised on January 1, 2006, or at anytime thereafter until November 1, 2007 (the "Expiration Date"). Optionee shall have 60 days from the Expiration Date to exercise the Option. If Optionee fails to exercise the Option within 60 days from the Expiration Date, the Option shall terminate and this agreement shall become null and void.

## ARTICLE 2.

## Option Price: Property

2.1     The Optionee shall pay the Optionor a sum equal to the Base Price of the Property, plus the Option Premium and Escalator (as defined herein.)

2.2     The Base Price of the Property (the "Base Price") shall equal EIGHT HUNDRED SIXTY FOUR THOUSAND AND NO /100 DOLLARS ($864,000.00).

2.3     Optionee shall pay to the Optionor the sum of TWENTY ONE THOUSAND SIX HUNDRED DOLLARS *($21,600.00)* for the sole and exclusive right and option to purchase said property (the "Option Premium").

2.4     Beginning on January 1, 2006, the cost to exercise the Option shall be adjusted by an escalation formula (the "Escalator"), as set forth in Article 3.

## ARTICLE 3.

## Escalator

3.1     The Base Price of the Property shall provide the basis for the Escalator. If the Option is exercised at any time prior to May 1, 2006, the Base Price shall be multiplied by Fifteen Percent (15%) and divided by THREE HUNDRED SIXTY (360) to determine the Escalator. The Escalator produces a daily per diem of THREE HUNDRED SIXTY and NO / 100 Dollars ($360.00). The Escalator shall equal the number of days from January 1, 2006 to the date of closing, then multiplied by the per diem.

For Example: If the Option was exercised on January 25, 2006, the cost to exercise the Option would be $894,600.00. [Base Price of $864,000.00 + Option Premium of $21,600.00 + Escalator of $9,000.00 ($360 * 25 days = $9,000) equals $894,600.00.]

3.2     If the Option is exercised at any time after April 30, 2006, the Base Price shall be multiplied by Twelve and One-half Percent (12.5%) and divided by THREE HUNDRED SIXTY (360) to determine the Escalator. This rate shall remain in effect until the Option terminates.

2

For Example: If the Option was exercised on May 25, 2006, the cost to exercise the Option would be $894,600.00. [Base Price of $864,000.00 + Option Premium of $21,600.00 + Escalator of $9,000.00 ($300 * 115 days = $34,500.00) equals $920,100.00.]

## ARTICLE 4.

### Purchase Price and Payment Terms and Transfer of Title

4.1     The Purchase Price shall be determined as set forth in Articles' 2 and 3.

4.2     Notwithstanding any other provisions contained herein, Optionee shall provide Optionor written notice no less than 45 days prior to exercising the Option (the "Written Notice"). The Written Notice must identify the date that Optionee chooses to exercise the Option (the "Exercise Date"). If Optionee fails to exercise the Option within 30 days of the Exercise Date, Optionor shall have the right to cancel the Option. If Optionor chooses to cancel the Option, it must send a written Notice of Cancellation to Optionee via Certified Mail no later than 45 days after the Exercise Date. If Optionor does not cancel the Option within 45 days of the Exercise Date, this Agreement shall remain in full force and effect.

4.3     The Written Notice shall contain the words "Notice of Intent to Close" at the top of the letter, and shall be mailed to the Optionor at the following address, or some other place, as directed by the Optionor:

Country Square Apartments, LLC
2145 Country Square Lane
Richfield, WI 53076

4.4     Notwithstanding any other provisions contained herein, this agreement does not specifically prohibit Optionor from mortgaging said property. Optionor must be able to satisfy the mortgage with respect to the incremental portion of the property being optioned within 30 days of closing, on that parcel. A payoff statement with regard to that particular parcel prior to closing shall be satisfactory evidence of the same. Failure to provide a recordable satisfaction of mortgage, or certificate of release, with respect to the parcel purchased, shall be considered a material breach of this agreement by the Optionor.

4.5     Closing and transfer of title shall take place at the Law Offices of Fischer & Fischer, located at 8655 Eagle Point Boulevard, Lake Elmo, Minnesota 55042. Optionee agrees to pay, at closing of title, the Transfer Fee applicable to this transaction, and other related costs, including but not limited to the property taxes on said Property.

## ARTICLE 5.

### Title

5.1     Title to the Property shall be good and marketable and such as will be insured with normal and reasonable exceptions, provided same do not impair the use

3

of the property as proposed by Optionee, by a reputable title insurance company of Optionee's selection, authorized to do business in the State of Minnesota, at regular rates and without special premium. Without limiting the foregoing, title to the property shall be free and clear of liens, encumbrances, and restrictions. The property may be subject to easements for utilities, provided same do not interfere with the proposed development of the property. Optionee has carefully examined the Title Binder attached hereto with specific attention to the easements for utilities and the expansion of utilities and acknowledges that he is familiar with the contents of the Title Binder.

## ARTICLE 6.

### Right of Entry for Tests

6.1    On or after the execution of the within Option, whether or not this Option has been exercised, Optionee and its representatives may at any reasonable time, from time to time, enter upon the property for the purposes of inspecting the same, making surveys, maps, or contour studies, performing test borings, soil tests and/or examinations, and conducting other engineering studies; provided, however, that Optionee first notify Optionor of its intention to do so and arrange the same at convenient time or times, and conduct said tests, inspections, surveys, studies, and/or examinations without interference with the operation of the property by said Optionor and its employees and/or tenants, and in the event of any test borings or soil tests, the same will be conducted in such a way as to prevent damage or interference with said property operation, and any test holes will be covered up and replaced in a proper workmanlike fashion. Optionee will be required to notify Optionor or its attorney prior to the entrance upon said premises of any of Optionee's representatives for said purposes. In the event Optionee causes any loss or damage to Optionor's or Tenant's property, Optionee shall be responsible for reimbursing Optionor or Tenant for same. Optionee shall indemnify and hold harmless the Optionor from any claims for damages from the Tenant, resulting from Optionee's entry or tests on Optionor's land.

## ARTICLE 7.

### Closing: Conveyances Necessary for Site Improvements

7.1    Although it is the intent of the parties that Optionee shall bear the cost of all improvements to the property, it will likely be necessary for Optionor to engage in the execution of certain conveyances and other documents necessary for the completion of said improvements. Therefore it is necessary that Optionor specifically agrees to expeditiously, with all due deliberate speed, cooperate and/or proceed with all state, county, and local boards for all site plan variances and other approvals necessary, at the direction of Optionee, at the cost of Optionee. Any failure of the Optionor to proceed with all due diligence and speed shall be viewed as a material breach of contract.

7.2    Site improvements may include, but are not limited to roadways, alteration of roadways, sewer and water systems, utility infrastructure, common area

4

development, and other improvements. The execution of easements and other necessary conveyances for these for said site improvements shall take place within 30 days of receipt of the proposed conveyance, or upon an earlier date, in the event both parties agree thereto.

7.3 Closing of said conveyance(s) shall take place at the Law Offices of Fischer & Fischer.

7.4 Optionee agrees to pay, at closing of title, the Transfer Fee applicable to this transaction, and other related costs.

## ARTICLE 8.

### Closing Adjustments

8.1 Real estate taxes, special assessments, water charges and sewer rents, if any, shall be paid by the Optionee during the term of the Agreement.

## ARTICLE 9.

### Violations

9.1 Optionor represents that at the date of this Agreement, there are no violations of the laws, ordinances, rules, or regulations of any governmental authority having jurisdiction of the Property, nor does Optionor have knowledge of any facts which if known by any such authority would cause a violation to be placed thereon, and any notice of violation affecting the Property at the date of exercise of the Option and/or the date of closing shall be complied with by Optionor, at its sole cost and expense, so that the Property shall be conveyed free of same. Optionor represents that it has not placed any hazardous waste or hazardous substances on or under the premises and, to the best of its knowledge, there are no hazardous wastes or hazardous substances on or under the premises and, to the best of its knowledge, there are no hazardous wastes or hazardous substances on or under the property, it being understood that the property has been utilized for farming and in the course thereof. If required, Optionor will sign any necessary letters or applications which may be required for compliance with the provisions of the applicable local, state and Federal environmental statutes and regulations. Optionor represents that the premises are not in a flood plain, watershed, or flood hazard area or zone. Optionee shall provide Optionor with notice of any toxic waste concerns or hazardous waste or hazardous substance concerns within sixty (60) days of the date of this Agreement or same shall be deemed waived.

## ARTICLE 10.

### Broker

10.1 Optionor and Optionee represent and warrant to each other that no real estate broker shall receive a commission or other form of compensation upon the conveyances contemplated herein. If either party elects to utilize the

5

service of a broker, it shall do so upon its own accord, and the other party shall not be obligated to pay for any service of the same.

## ARTICLE 11.

### Limitation of Liability

11.1   Optionee's liability for breach of this Agreement shall be limited to the Option Premium(s), as stated herein, which the parties agree shall constitute full and complete liquidated damages for any default hereunder by Optionee. Optionor agrees that it is obligated to specifically perform its obligations and duties, as stated herein and failure to do so, shall constitute a breach. Upon breach Optionee may be entitled to equitable remedies as well as any costs incurred, which may include but are not limited to those costs associated with site improvements, and option premiums paid to date.

## ARTICLE 12.

### Condemnation and Risk of Loss

12.1   If, during the pendency of this Option, or after its exercise but before closing, there shall be any condemnation proceedings or eminent domain proceedings pending or contemplated against the Property, affecting all or any portion thereof, or the access thereto or therefrom, or all or any portion of the Property or the access thereto or therefrom is affected by any map filed, or otherwise, the Optionor may, at its sole discretion (i) elect to be bought out for the principle cost of the remaining land and forfeit any future option premiums, by providing Ninety days written notice to Avidigm Capital Group, Inc., or (ii) proceed to closing as provided hereunder, in which latter event, all awards or settlements under any such proceedings, whether or not made prior to closing, shall become the property of Optionee, Optionor hereby assigning to Optionee any claim or interest therein, and Optionee hereby agreeing to execute any documents reasonably required in connection herewith after closing by Optionee. The provisions of this Article shall survive closing of title hereunder.

## ARTICLE 13.

### Other Covenants

13.1   Optionor agrees that Optionee may apply to the appropriate governmental authorities having jurisdiction thereof to secure subdivision approvals, site plan approvals, issuance of building permits, curb cut approvals, and various other approvals and permits, necessary or desirable for the development of the Property. Optionor agrees to execute all necessary documents and take all actions as shall be necessary, and otherwise cooperate with Optionee in connection with such applications. Optionor agrees that, in its absence or during times when it is unavailable, Jason E. Fischer, Esq. shall be authorized to review all applications and submissions for development approval and shall further be authorized to execute same as attorney in fact for the Optionor.

6

## ARTICLE 14.

### Notices

14.1 All notices hereunder shall be in writing and sent by United States registered or certified mail, postage prepaid, return receipt requested, to the parties at their respective addresses set forth above, or to such other addresses as either party may from time to time specify by appropriate notice hereunder. Specifically, copies of all notices to be sent to Optionor shall be mailed to its attorney, to wit:

Law Offices of Fischer & Fischer
Jason E. Fischer, Attorney at Law
8655 Eagle Point Boulevard
Lake Elmo, Minnesota 55042

and copies of all notices to be sent to Optionee shall be sent to:

Chuck Senn
Country Square Apartments, LLC
2145 Country Square Lane
Richfield, WI 53076

14.2. All notices hereunder, including, without limitation, those notices whereby Optionee exercises its Option hereunder, shall be effective upon deposit of same into the United States Mails.

## ARTICLE 15.

### Exercise of Option No Waiver

15.1 Optionee's exercise of its Option hereunder shall not constitute a waiver by it of any of the terms and provisions hereunder, including, without limitation, the conditions as to title and as to the truth of Optionor's representations.

## ARTICLE 16.

### Recordation of Notice

16.1 Optionor and Optionee agree that the within Option shall not be recorded in the Kandiyohi County Clerk's Office prior to closing of title. However, in the event Optionee wishes to have a memorandum or notice of said Option made of record in the Kandiyohi County Clerk's Office at any time hereafter, it may do so in compliance with the provisions of a separate "Memorandum of Option executed by the parties and their attorneys and bearing even date herewith and attached as Exhibits B.

7

# ARTICLE 17.

## Binding Effect

17.1 This Agreement shall be binding upon the parties hereto and upon their respective heirs, administrators, successors, executors, legal representatives, and assigns.

17.2 Optionor and Optionee agree that Time is of the Essence for all dates set forth in this contract.

17.3 All obligations and indemnities to be performed after this Agreement is executed shall survive the execution and delivery of this Agreement.

17.4 Upon the full performance of this agreement Optionor shall execute and deliver to Optionee a Quit Claim Deed for the entire tract(s) of the property, as defined herein.

17.5 A Discharge of Option Agreement within THIRTY (30) days of full performance shall be executed by the parties and their attorneys and bearing even date herewith and attached as Exhibits C, and made of record in the Kandiyohi County Clerk's Office.

# ARTICLE 18.

## Miscellaneous

18.1 Optionee agrees to give over to Optionor all engineering documents, and other papers prepared by Optionee, used in its application to obtain its approvals, in the event there is no closing of title.

18.2 This Option shall be interpreted under the laws of the state of Minnesota.


**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed on the day and year set forth above. This document may be executed in counter-parts and/or by facsimile.


Country Square Apartments, LLC          Avidigm Capital Group, Inc.


Dated: *11-4-05*                        Dated: *11/4/05*

By: *Senn*                              By: *Steven J. Mattson*

    Chuck Senn                              Steven J. Mattson

Its: *CHIEF MANAGER.*                   Its: *Avidigm Capital Group, INC.,*
                                             *CEO*

8

Exhibit 13

## PROMISSORY NOTE

Effective July 30, 2005

FOR VALUE RECEIVED, the undersigned (the "Maker") promises to pay to the order of Country Square Apartments (the "Holder"), at 2145 Country Square Lane - Richfield, WI 53076, or at such other address as the holder hereof may from time to time designate in writing, the principal sum of $471,113.80, payable with interest at 10% per annum in one installment of $518,225.18, on July 30, 2006 (the "Maturity Date"), when the outstanding principal balance and accrued but unpaid interest thereon is due and payable.

The indebtedness evidenced hereby may be prepaid in whole or in part at any time without premium or penalty. In the event the Maker chooses to prepay this Note, the amount of indebtedness due shall be reduced by a daily per-diem of $129.07 multiplied by the number of days from the Maturity Date upon which the payoff occurs.

This Note is secured by certain real property in as more fully described on Exhibit A, attached hereto. All or any part of the principal sum may be prepaid at any time without penalty.

If any payment required to be made hereunder is not made in full when due, the Holder may declare the Maker in default and, the whole of the principal sum shall, at the option of the Holder hereof, become immediately due and payable in the event such default continues for thirty (30) days after written notice of such default is given by the holder of this Note to the Maker. Holder and Maker may agree to extend the Maturity Date at any time by both parties agreeing to the same in writing.

Failure of the Holder hereof to exercise this option with respect to any such default shall not constitute a waiver of the right to exercise the same with respect to such default or any prior or subsequent default.

All persons now or hereafter liable for the payment of the principal due on this Note, or any part thereof, do hereby expressly waive presentment for payment, notice of dishonor, protest and notice of protest, and agree that the time for the payment or payments of any part of this Note may be extended without releasing or otherwise affecting their liability on this Note or the lien of any security securing this Note.

The holder of this Note agrees not to seek or obtain any deficiency or money judgment but to look solely to the property covered by the deed of trust securing this Note for payment of the debt evidenced by this Note.

By: _____

Jason Fischer

**S0094**

Exhibit 14

DEED OF TRUST

THIS DEED OF TRUST, is made this **30th** day of March, 2006, by Jason Fischer, on behalf of Agassiz Ridge, LLC, a Minnesota limited liability company, 12 Long Lake Road, Suite 19, Mahtomedi, MN 55115, Grantor, (herein referred to as "Borrower"), and the Grantee, Charles Senn, 2145 Country Square Lane - Richfield, WI 53076,Trustees, any one of whom may act, (herein collectively referred to as "Trustee"), and the Beneficiary, Country Square Apartments , 2145 Country Square Lane - Richfield, WI 53076.

WITNESSETH:

WHEREAS, Grantor is justly indebted unto the order of Country Square Apartments, LLC, in the principal sum of $471,113.80, for which amount the Grantor has signed and delivered its promissory note (the "Note"), of even date herewith, payable to the order of Country Square Apartments, LLC, in the principal amount of $471,113.80, together with interest at the rate of 10% on the following terms and obligations:

NOW THEREFORE, This Deed of Trust Witnesseth: That to secure the prompt payment of said indebtedness and all charges and advances as in said Note and as herein provided, the Grantor, in consideration of the sum of One Dollar cash in hand paid, the receipt of which is hereby acknowledged, does hereby grant and convey, with General Warranty of Title, unto the Trustees the following properties legally described as follows, to wit:

A.   Real Property

See Exhibit A

In Trust to secure the prompt payment of the indebtedness above described and hereby secured and the performance by Grantors of the conditions, obligations and stipulations in said promissory note and this Deed of Trust; and upon the full payment of all said note and any extensions or renewals thereof, and interest thereon, and all moneys advanced or expended as provided for in said promissory note or as herein provided, and all other costs, attorney's fees, charges, commissions, and expenses, at any time before the sale herein provided for to release and re-convey the said land and premises unto and at the cost of the Grantor or the party or parties then claiming under said Grantor.

This Deed of Trust also is given to secure reimbursement to the holder of said note and to Trustees, and any purchaser or purchaser under any sale or sales as provided by this Trust, for any and all costs and expenses incurred in respect thereto, including reasonable counsel fees incurred or paid on account of any litigation at law or inequity which may arise in respect to this Trust, or in to indebtedness on the security property, or in obtaining possession of the premises after any sale which may be made as herein provided.

The irrevocable power to substitute one or more of the trustees named herein or substituted therefore is expressly reserved to the holder of the note secured by this Deed of Trust, to be exercised any time hereafter no matter how often without notice and without specifying any reason therefore by filing for record among the land records where this instrument is recorded a Deed of Appointment, and thereupon all of the title and estate, powers, rights, and duties of the trustee thus superseded shall terminate and shall be vested in the successor trustee or trustees. The Grantor and Trustees herein named or that hereafter may be substituted hereunder expressly waive notice of the exercise of this power, the giving of bond by any trustee, and any requirement for application by any Court for the removal substitution, or appointment of a trustee hereunder.

If the security property, or any part thereof, is damaged by fire or other hazard against which insurance is held as herein provided, the amounts paid by any insurance company pursuant to the contract of insurance shall, to the extent of the indebtedness then remaining unpaid, be paid to the holder of the note secured hereby, and, at his option may be applied to the debt or released for the repairing or rebuilding of the premises.

<strong>S0095</strong>

The provisions of this Deed of Trust, shall be binding upon and insure to the benefit of the Grantor, her heirs, personal representatives, successors and assigns, the Trustees and any successor, or substitute trustee or trustees, and the holder of the note hereby secured. Whenever used herein, the singular, and the use of any gender shall be applicable to all genders.

WITNESS, the following signatures and seals the day and year first hereinabove written

Agassiz Ridge LLC

By: _____

Jason Fischer

Its: Chief Manager

State of _Minnesota_ )

City/County of _Washington_

The foregoing Deed of Trust was acknowledged before me this _30_ day of March, 2006 by Jason Fischer, on behalf of Agassiz Ridge , LLC.

_____ (Seal)
Notary Public

My Commission Expires:_____

DEBORAH L. TEICH
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 201_

**S0096**

# EXHIBIT A

Lot 2, Block 2, Lot 13, Block 2, and Lot 1, Block 3, Agassiz Ridge, County of Becker, State of Minnesota.

**S0097**

Exhibit 15

**MORTGAGE**              **Form No. 42-M**           **Minnesota Uniform Conveyancing Blanks (2004)**

By Business Entity           *(Top Three Inches Reserved for Recording Data)*

MORTGAGE REGISTRY TAX DUE: $ **1,083.56**

Date: **May 19, 2006**

☐ **CHECK IF APPLICABLE:** NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, ENFORCEMENT OF THIS MORTGAGE IN MINNESOTA IS LIMITED TO A DEBT AMOUNT OF $_____ UNDER CHAPTER 287 OF MINNESOTA STATUTES.

THIS MORTGAGE ("**Mortgage**") is given by **Agassiz Ridge, LLC**_____,

                                  *(Insert Name of Business Entity)*

a(n) **Minnesota limited liability company**_____, as mortgagor (whether one or more) ("**Borrower**"), to

          *(Insert State of Formation and Type of Business Entity)*

**Country Square Apartments, LLC, a Wisconsin limited liability company**_____, as mortgagee ("**Lender**"). In consideration of the

          *(Insert Name of Lender)*

receipt of **Four Hundred Seventy One Thousand One Hundred Thirteen and 80/100s**_____ Dollars ($ **471,113.80**_____)*(Insert Amount of Indebtedness)* (the "**Indebtedness**") from Lender, Borrower hereby mortgages, with power of sale, the real property in **Becker**_____ County *(Insert Name of County in which Property is located)*, Minnesota, described as follows *(Insert Legal Description)*:

  See Exhibit A attached hereto and incorporated herein

Together with all hereditaments and appurtenances belonging thereto (the "**Property**"), subject to:

      (a)    Covenants, conditions, restrictions (without effective forfeiture provisions) and declarations of record, if any;

      (b)    Reservations of minerals or mineral rights by the State of Minnesota, if any;

      (c)    Utility and drainage easements which do not interfere with present improvements;

      (d)    Applicable laws, ordinances and regulations;

      (e)    The lien of real estate taxes and installments of special assessments not yet due and payable; and

      (f)    The following liens or encumbrances, if any *(Insert Encumbrances)*:

Borrower covenants with Lender as follows:

    **⎩of July 30, 2005 ⎭**

       1.  **Repayment of Indebtedness.** If Borrower (a) pays the Indebtedness to Lender according to the terms of the promissory note or other instrument ~~of even date herewith~~ that evidences the Indebtedness and all renewals, extensions and modifications thereto (the "**Note**"), final payment of which is due on July 30, 2006_____ *(Insert Maturity Date)*; (b) pays interest on the Indebtedness as provided in the Note; (c) repays to Lender, at the times and with interest as specified, all sums advanced in protecting the lien of this Mortgage, if any; and (d) keeps and performs all the covenants and agreements contained herein, then Borrower's obligations under this Mortgage will be satisfied and Lender will deliver an executed satisfaction of Mortgage to Borrower. It is Borrower's responsibility to record any satisfaction of this Mortgage at Borrower's expense.

       2.  **Statutory Covenants.** Borrower makes and includes in this Mortgage the following covenants and provisions set forth in Minnesota Statutes Section 507.15, and the relevant statutory covenant equivalents contained therein are hereby incorporated by reference:

      (a)    To warrant the title to the Property;

      (b)    To pay the Indebtedness as herein provided;

(c) To pay all taxes;

(d) That the Property shall be kept in repair and no waste shall be committed;

(e) To pay principal and interest on prior mortgages (if any).

3. **Additional Covenants and Agreements of Borrower.** Borrower makes the following additional covenants and agreements with Lender:

(a) Borrower shall keep all buildings, improvements, and fixtures now or later located on all or any part of the Property (collectively, the "**Improvements**") insured against loss by fire, lightning, and such other perils as are included in a standard all-risk endorsement, and against loss or damage by all other risks and hazards covered by a standard extended coverage insurance policy, including, without limitation, vandalism, malicious mischief, burglary, theft, and if applicable, steam boiler explosion. Such insurance shall be in an amount no less than the full replacement cost of the Improvements, without deduction for physical depreciation. If any of the Improvements are located in a federally designated flood prone area, and if flood insurance is available for that area, Borrower shall procure and maintain flood insurance in amounts reasonably satisfactory to Lender. Borrower shall procure and maintain liability insurance against claims for bodily injury, death, and property damage occurring on or about the Property in amounts reasonably satisfactory to Lender and naming Lender as an additional insured, all for the protection of the Lender.

(b) Each insurance policy required pursuant to Paragraph 3(a) must contain provisions in favor of Lender affording all right and privileges customarily provided under the so-called standard mortgagee clause. Each policy must be issued by an insurance company or companies licensed to do business in Minnesota and acceptable to Lender. Each policy must provide for not less than ten (10) days written notice to Lender before cancellation, non-renewal, termination, or change in coverage. Borrower will deliver to Lender a duplicate original or certificate of such insurance policies and of all renewals and modifications of such policies.

(c) If the Property is damaged by fire or other casualty, Borrower must promptly give notice of such damage to Lender and the insurance company. In such event, the insurance proceeds paid on account of such damage will be applied to payment of the amounts owed by Borrower pursuant to the Note, even if such amounts are not otherwise then due, unless Borrower is permitted to make an election as described in the next paragraph. Such amounts first will be applied to unpaid accrued interest and next to the principal to be paid as provided in the Note in the inverse order of their maturity. Such payment(s) will not postpone the due date of the installments to be paid pursuant to the Note or change the amount of such installments. The balance of insurance proceeds, if any, will be the property of Borrower.

(d) Notwithstanding the provisions of Paragraph 3(c), and unless otherwise agreed by Borrower and Lender in writing, if (i) Borrower is not in default under this Mortgage (or after Borrower has cured any such default); (ii) the mortgagees under any prior mortgages do not require otherwise; and (iii) such damage does not exceed ten percent (10%) of the then assessed market value of the Improvements, then Borrower may elect to have that portion of such insurance proceeds necessary to repair, replace, or restore the damaged Property (the "**Repairs**") deposited in escrow with a bank or title insurance company qualified to do business in Minnesota, or such other party as may be mutually agreeable to Lender and Borrower. The election may only be made by written notice to Lender within sixty (60) days after the damage occurs; and the election will only be permitted if the plans, specifications, and contracts for the Repairs are approved by Lender, which approval shall not be unreasonably withheld, conditioned, or delayed. If such a permitted election is made by Borrower, Lender and Borrower shall jointly deposit the insurance proceeds into escrow when paid. If such insurance proceeds are insufficient for the Repairs, Borrower shall, before the commencement of the Repairs, deposit into such escrow sufficient additional money to insure the full payment for the Repairs. Even if the insurance proceeds are unavailable or are insufficient to pay the cost of the Repairs, Borrower shall at all times be responsible to pay the full cost of the Repairs. All escrowed funds shall be disbursed in accordance with sound, generally accepted, construction disbursement procedures. The costs incurred or to be incurred on account of such escrow shall be deposited by Borrower into such escrow before the commencement of the Repairs. Borrower shall complete the Repairs as soon as reasonably possible and in a good and workmanlike manner, and in any event the Repairs shall be completed by Borrower within one (1) year after the damage occurs. If, following the completion of and payment for the Repairs, there remains any undisbursed escrow funds, such funds shall be applied to payment of the amounts owed by Borrower under the Note in accordance with Paragraph 3(c).

(e) If all or any part of the Property is taken in condemnation proceedings instituted under power of eminent domain or is conveyed in lieu thereof under threat of condemnation, the money paid pursuant to such condemnation or conveyance in lieu thereof must be applied to payment of the amounts due by Borrower to Lender under the Note as set forth in Paragraph 3(c), even if such amounts are not then due to be paid.

(f) Borrower will diligently complete all Improvements, if any, that may now or hereafter be under construction on the Property.

(g) Borrower will pay all dues, fees or assessments, if any, which are due and payable by Borrower to any homeowners or similar association as a result of the Property's inclusion therein.

(h) Borrower will pay any other expenses and attorneys' fees incurred by Lender pursuant to the Note or as reasonably required for the protection of the lien of this Mortgage.

4. **Payment by Lender.** If Borrower fails to pay any amounts to be paid hereunder to Lender or any third parties, or to insure the Improvements, and deliver the policies as required herein, Lender may make such payments or secure such insurance. The sums so paid shall be additional Indebtedness, bear interest from the date of such payment at the same rate set forth in the Note, be an additional lien upon the Property, and be immediately due and payable upon written demand. This Mortgage secures the repayment of such advances.

5. **Default.** In case of default (i) in the payment of sums to be paid under the Note or this Mortgage, when the same becomes due, (ii) in any of the covenants set forth in this Mortgage, (iii) under the terms of the Note, or (iv) under any Addendum attached to this Mortgage, Lender may declare the unpaid balance of the Note and the interest accrued thereon, together with all sums advanced hereunder, immediately due and

Exhibits for Response to Attachment Motion

JF

payable without notice, and Borrower hereby authorizes and empowers Lender to foreclose this Mortgage by judicial proceedings or to sell the Property at public auction and convey the same in fee simple in accordance with Minnesota Statutes Chapter 580, and out of the monies arising from such sale, to retain all sums secured hereby; with interest and all legal costs and charges of such foreclosure and the maximum attorneys' fees permitted by law, which costs, charges and fees Borrower agrees to pay.

     6.   **Governing Law; Severability.** This Mortgage shall be governed by the laws of Minnesota. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision.

     7.   **Additional Terms.** Check this box ☐ if Form 41.5 or other Addendum (either one or more) containing additional terms and conditions is attached to this Mortgage. The number of additional attached pages is _____ *(Insert Number of Pages in Addendum). (Note: If the foregoing box is not checked, then this Mortgage shall not contain any such additional terms and conditions.)*

Terms of this Mortgage will run with the Property and bind the parties hereto and their successors in interest.

BORROWER

AGASSIZ RIDGE, LLC
*(Insert Name of Business Entity)*

By: _____
*(Signature of Authorized Signatory)*

Name: Jason Fischer
*(Type or Print Name of Authorized Signatory)*

Its: Chief Manager
*(Insert Title of Authorized Signatory)*


By: _____
*(Signature of Second Authorized Signatory, If Necessary)*

Name: _____
*(Type or Print Name of Second Authorized Signatory)*

Its: _____
*(Insert Title of Second Authorized Signatory)*

STATE OF MINNESOTA   )
                   ) ss.
COUNTY OF Ramsey )

The foregoing instrument was acknowledged before me on May 19, 2006, by Jason Fischer the Chief Manager of Agassiz Ridge, LLC, a Minnesota limited liability company, on behalf of the limited liability company.

Pamela Zaspel Torreson

Check here if part or all of the land is Registered (Torrens) ☐

<table>
<tr><td>THIS INSTRUMENT WAS DRAFTED BY (NAME & ADDRESS):<br><br>Paul S. Moe<br>Faegre & Benson LLP<br>2200 Wells Fargo Center<br>90 South Seventh Street<br>Minneapolis, MN 55402</td><td>NOTARIAL STAMP OR SEAL (OR OTHER TITLE OR RANK):<br><br>**PAMELA ZASPEL TORRESON**<br>NOTARY PUBLIC – MINNESOTA<br>MY COMMISSION EXPIRES 1-31-08</td></tr>
</table>

**FAILURE TO RECORD OR FILE THIS MORTGAGE MAY GIVE OTHER PARTIES PRIORITY OVER THIS MORTGAGE**

JF

## Exhibit A

**Lots 1 - 3, Block 1, Agassiz Ridge, Becker County, Minnesota**
**Lots 1-12, Block 2, Agassiz Ridge, Becker County, Minnesota**
**Lot 1, Block 3, Agassiz Ridge, Becker County, Minnesota**

**Initials:**

Exhibit 16

*Original for Recording*

## SHERIFF'S CERTIFICATE OF SALE AND FORECLOSURE RECORD

Date: July 5, 2007.

I, Tim Gordon, Sheriff of Becker County, Minnesota, certify that:

1.  Pursuant to the attached Notice of Mortgage Foreclosure Sale ("Notice") and the power of sale contained in the Mortgage described in the Notice, which Mortgage was executed by Agassiz Ridge, LLC, a Minnesota limited liability company, as Mortgagor, in favor of U.S. Federal Credit Union, a federal credit union, as Mortgagee, dated February 2, 2006, and recorded on February 3, 2006, as Document No. 533183, in the office of the County Recorder in and for Becker County, Minnesota, I offered for sale and sold at public auction to the highest bidder at the time and place specified in the Notice the property legally described as follows:

    The following real property located in Becker County, Minnesota, and legally described as follows:

    That part of the Southeast Quarter of Section 30, Township 139 North, Range 42 West and that part of Government Lot 10, Section 29, Township 139 North, Range 42 West all in Becker County, Minnesota, lying northerly and easterly of a line described as:

    Commencing at the East Quarter corner of said Section 30; thence proceeding South 89 degrees 55 minutes 12 seconds West (assumed bearing) a distance of 1941.55 feet along the north line of said Southeast Quarter of Section 30 to the beginning of the line to be described; thence South 03 degrees 30 minutes 00 seconds West 580.06 feet; thence South 06 degrees 28 minutes 20 seconds West 220.70 feet; thence South 78 degrees 24 minutes 40 seconds East 153.37 feet; thence North 15 degrees 43 minutes 55 seconds East 143.00 feet; thence South 82 degrees 25

minutes 21 seconds East 394.61 feet; thence North 06 degrees 13 minutes 50 seconds East 436.99 feet; thence South 89 degrees 02 minutes 35 seconds East 419.70 feet; thence South 08 degrees 23 minutes 00 seconds East 295.73 feet; thence South 12 degrees 53 minutes 35 seconds East 514.62 feet; thence South 31 degrees 44 minutes 15 seconds East 655.46 feet; thence South 05 degrees 56 minutes 00 seconds West 241.00 feet; thence South 44 degrees 05 minutes 32 seconds West 796.08 feet; thence South 79 degrees 11 minutes 15 seconds East 283.00 feet more or less to the shore of Little Cormorant Lake and there terminating said line.

Subject to a private roadway running on and along the North boundary line of the above described parcel ("Property").

2.    The sale was held on July 5, 2007, at 10:00 a.m. at the Becker County Sheriff's office located at Lobby of Law Enforcement Center, 925 Lake Avenue, Detroit Lakes, MN 56501, and the price paid for said Property was Two Hundred Forty Five Thousand Nine Hundred Seventy Four and 22/100 Dollars ($245,974.22).

3.    The purchaser was U.S. Federal Credit Union, a federal credit union.

4.    The sale was in all respects openly, honestly, fairly and lawfully conducted.

5.    The time allowed by law for redemption by Mortgagor or Mortgagor's personal representatives or assigns is six (6) months after the date of the sale.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK AND THE FOLLOWING PAGE IS THE SIGNATURE AND NOTARY PAGE.**

2